UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GUY FISHER | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 06-12304-JGD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

March 30, 2010

DEIN, U.S.M.J.

## OVERVIEW

This case involves an accident which occurred on July 22, 2004 while the plaintiff, Guy Fisher, was repairing the HVAC system at the Brockton VA hospital. Fisher suffered an electrical shock when his hand came in contact with exposed wires in an uncovered junction box in a crawl space above a refrigeration unit that Fisher was repairing. Fisher claims that the VA was negligent, and that he suffered permanent, debilitating injuries in the form of epilepsy as a result of the accident. He has not worked since June 8, 2005, and contends that he may never be able to work again.

The government contends that it was not negligent and had no reason to know of the condition of the junction box, and that, in any event, it had no duty to warn about an open and obvious danger. It also contends that Fisher was more than 50% negligent,

thereby barring his recovery, that Fisher's epilepsy was not caused by the shock he received on July 22, 2004, and that Fisher is not permanently disabled.

The bench trial of this matter took place on September 21, 22 and 24, 2009. Twenty (20) witnesses testified, and sixty-six (66) exhibits were introduced. In addition, this court took a view of the accident site prior to trial. The parties submitted proposed findings and rulings on December 4, 2009. This court has reviewed the transcripts, exhibits and the parties' submissions. Based on the evidence presented, the court makes the following findings of fact and rulings of law. As detailed herein, this court finds that the VA was negligent in that it is more likely than not that its employees left the junction box uncovered, that Fisher was 50% contributorily negligent in failing to fully examine the crawl space before climbing in, that Fisher's epilepsy was a proximate cause of the shock he received, and that Fisher is likely to be able to work in the future, albeit at a reduced rate. This court finds that the government is liable to Fisher in the amount of $1,930,745.00 reduced by 50% to $965,372.50.

## FINDINGS OF FACT[1]

### Background

1.      The plaintiff, Guy Fisher ("Fisher"), was born in 1976.  He lives in

Brockton, Massachusetts, with his wife, Rachel Jenkins Fisher, and his 9 year old son.

Fisher and Rachel Jenkins have been together since before the accident, and were married

after his accident, on September 5, 2009.  (DF 1).

2.      Fisher graduated from Brockton High School and attended Massasoit

Community College.  He learned the trade of HVAC (heating, ventilation, and aircon-

ditioning) installation and repair at The Peterson School in Westwood, Massachusetts.

(DF 2-3).

3.      Fisher earned his HVAC license (also known as a universal license) and a

refrigeration license.  (DF 5).  As of the date of the accident in July 2004, Fisher had

seven (7) years of experience as an HVAC technician.  (DF 10).

4.      In July 2004, Fisher was employed by H-I-M Mechanical Systems, Inc. in

Bridgewater, Massachusetts, as an HVAC service technician.  In this capacity, he

installed and repaired heating, air conditioning and refrigeration equipment in industrial,

commercial and residential settings.  (DF 6).

---

[1]For ease the court has cited to the Plaintiff's Supplemental Findings of Fact and Rulings of Law
(Docket No. 53) ("PF") and the Defendant's Amended Proposed Findings of Fact and Conclusions of Law
(Docket No. 55 ) ("DF").  However, the court has reviewed the transcript in its entirety, and a reference to
the proposed findings does not mean that the court adopts the complete text of the proposed findings.  Other
citations are to the transcript volume and page number.

5.      The VA hospital in Brockton is a 450-bed facility located on a 145-acre campus with 22 buildings.  The hospital has hundreds of crawl spaces and thousands of junction boxes.  While there are regular safety inspections of the buildings, it would be unreasonable to require the VA to routinely inspect every crawl space given their number and the fact that they are only used infrequently and by few workers.  (DF 11-12).

6.      Because junction boxes contain electrical wires, they are supposed to be kept covered.  (DF 13).  In addition, the ends of the wires should be capped, usually with a wire nut.  An open junction box at the VA in July 2004 violated applicable National Fire Protection Association (NFPA) safety codes, including NFPA 70E, Article 215.1 "Covers for Wiring System Components."  (PF 1).

## Responsibility for the Uncovered Junction Box

7.      At the time of the accident, the junction box was uncovered and one of the wires had exposed ends, since the wire nut had come off.  I find that the plaintiff has proved by a preponderance of the evidence that the junction box was left in that condition by an employee of the VA.

8.      The evidence presented was that VA employees routinely did repair work throughout the facility, calling in outside repair persons only when necessary.  (See PF 14-17).  This work included working on junction boxes throughout the facility.  (PF 16, 20).  It also included going into crawl spaces.  (PF 14).

9.      When VA employees did maintenance or repair work, it was not always documented.  However, when an outside vendor was called in, at a minimum a purchase order was generated.  (PF 18)

10.     All witnesses agreed that only VA employees and H-I-M employees worked on the refrigeration unit or in the general area before the accident.  (I:127, 142).  I find, however, that H-I-M employees did not enter the crawl space or work on the junction box before the accident.

11.     HVAC technicians, including those from H-I-M, do not generally work on junction boxes.  (See PF 24).  To the extent that they work on electronic controls, these are the controls on the refrigeration unit, not on the electrical lines that supply power to the units.  (II: 8).  Moreover, HVAC technicians do not work on electrical components, such as the junction box.  Rather, they repair the refrigeration units themselves.  (PF 24).

12.     There was testimony from Robert Riley, a former VA employee, that he had been in the crawl space before the accident.  (PF 8).  However, his testimony was so confused as to the timing of his work in the crawl space that I find it credible only to the extent that it supports the fact that on various occasions VA employees worked in the crawl space.  (PF 8; see also DF 60-64).

13.     In response to a request from the VA to repair a refrigeration unit that was running warm, on June 18 and 21, 2004, an H-I-M employee, Steve Richards, worked on a refrigerator whose refrigeration pipes were located in the same crawl space where the accident occurred a month later.  (DF 57).  I accept and find credible the testimony of

Howard Matthew (Matt) Mitchell, the General Manager of H-I-M Mechanical Systems, that there was no reason for Steve Richards to have gone into the crawl space to do the called upon repair work.  There is no indication on the work order (Ex. 19) that Mr. Richards went into the crawl space, and the amount of time spent indicated that it was a fairly routine repair.  A few days later, as evidenced by Exhibit 21, Mr. Richards returned to install a fan motor in the refrigerator unit.  There would be no reason to go into the crawl space to replace the fan motor.  (PF 25-26).

14.     There is no evidence that any other outside contractor had worked in the crawl space.  (PF 23).

15.     When the plaintiff got to the job site, the screen was already off the opening to the crawl space.  (PF 11, DF 25).  This is further evidence that someone had been in the crawl space before the H-I-M technicians.

### The Date of the Accident

16.     On or about July 22, 2004, the VA Hospital notified H-I-M of a problem with a walk-in refrigerator located in the basement of Building 20 on the VA campus specifically, that the cooler was warm.  H-I-M sent Fisher and another HVAC technician, Peter Thiboutot, to make the repair.  After checking other possible reasons why the refrigerator was running warm, the men decided to check for a leak in the refrigeration pipes located in a crawl space on top of the walk-in refrigerator.  Neither man was warned of any potentially hazardous conditions in the crawl space.  (PF Stip.).

17.     Access to the crawl space was through a rectangular hole measuring 18" by 24" located 8 2/3 feet above the ground.  Either the plaintiff or Thiboutot got one of their ladders and set it up below the crawl space.  (PF Stip.).

18.     The men used a 6' ladder, as a result of which they had to hoist themselves up on the opening of the crawl space to get in.  (DF 26).  If they had used an 8' or 10' ladder, they would have been able to crawl into the opening and would have had a clearer view of what was in the crawl space.  (See DF 52).

19.     Separately, Thiboutot and Fisher climbed the ladder and looked into the crawl space without going in.  They each shone his flashlight in the crawl space, and did a cursory look inside, focusing on locating the refrigeration pipes.  (PF Stip.; DF 31-35).

20.     While Thiboutot noticed the junction box out of the corner of his eye, he did not focus on it and did not notice if it was uncovered or if there were any exposed wires.  (I:146).  Fisher does not remember seeing the junction box at all.  (I:228).  Defendant's expert Paul Konz testified that without a flashlight, the junction box was not clear, and just the outline was visible.  (II:181).

21.     Fisher knew that crawl spaces were dangerous places, that they could contain junction boxes, and that there could be exposed wiring, especially in older buildings.  (See DF 29).

22.     The junction box was clearly visible to anyone looking at the floor of the crawl space from a sufficient height.  (DF 18).  It is on top of the walk-in cooler, on the left side, very close to the cooler edge that faces the entrance to the crawl space.  It is

nearly in the path of anyone entering the crawl space.  (DF 16).  Thus, if the men had

looked and shone their flashlights at the floor of the crawl space in the direction of the

junction box, they would have noticed the junction box, which was clearly visible with a

flashlight.  (See II:181).  On the other hand, someone looking at the junction box would

not see the refrigeration pipes, which were further into the crawl space and higher up.

(See II:197).  Fisher and Thiboutot were going into the crawl space to check the

refrigeration lines.

23.     Since Fisher was the smaller of the two men, it was decided that he would

go into the crawl space.  Fisher walked up the ladder, put his flashlight and his bottle of

leak detector on the ledge of the crawl space, and then attempted to hoist himself into the

crawl space.  As he attempted to crawl in, his left hand touched an exposed wire in the

uncovered junction box located inside the crawl space, on the left.  Fisher received an

electric shock.  (PF Stip.).

24.     Although Fisher does not remember exactly what happened, it appears that

in hoisting himself up, Fischer grabbed the junction box with his left hand and the

conduit with his right hand.  In so doing, his left hand touched a live wire coming out of

the junction box.  (DF 39).  The electricity entered Fisher's left hand and out his right

hand causing burns to both hands.  (Id.; PF Stip.).

25.     I find that the nut was already off the end of the wire or had been

improperly loosened before Fisher touched the wire.  According to defendant's expert

Paul Konz, it is not at all likely that any vibrations or normal wear and tear would cause

the nut to loosen on its own.  (I:195).  Thus, Fisher could only have dislodged the nut if it was already loose.  (Id.).

26.     If Fisher had seen that the junction box was uncovered before entering the crawl space, he would not have touched the box since he knew the dangers of exposed wires.  (DF 37).

27.     Fisher was stuck on the current somewhere between 10 seconds and a minute.  (PF 47).  I find credible Fisher's testimony that, at least momentarily,  he couldn't let go of the pipes; he kicked off the wall and that forced him back out of the hole he was leaning in.  (I:225).

28.     When he was horizontal in the crawl space and touched the box, Fisher's legs began shaking.  (I:34).  He was able to jump/hobble down the ladder where he sat on the floor and rested.  (I:34; DF 41).  He did not lose consciousness.  (DF 41).

29.     Thiboutot climbed up the ladder to see what had happened.  He saw the junction box and an exposed wire laid over the back lip of the box.  Thiboutot tested the wire and it was live.  (I:38).  Thiboutot did not see a wire nut or a junction box cover. (I:51-52).

30.     Thiboutot is about five inches shorter than Fisher.  Since Thiboutot saw the junction box when he was looking for it, I find that Fisher would have seen the box and seen that it was uncovered if he had looked at the floor of the crawl space before entering. (DF 42).

31.     The hospital's Food Service Supervisor, John Pruyn, was in the building and was found by either Fisher or Thiboutot.[2] Mr. Pruyn suggested that Fisher go to the emergency room, and called the emergency room to alert them to Fisher's coming. (DF 43). Mr. Pruyn also contacted James Orcutt who was the boiler plant operator who was working at the time. (DF 44). Mr. Orcutt, in turn, contacted an HVAC technician from the VA. (Id.).

32.     Thiboutot drove Fisher to the emergency room at the VA Hospital, where he was treated and then released at about 6:50 p.m. (PF Stip.). At the emergency room, Fisher complained of tingling and cramping in both hands as well as tremors in his hands and weakness in flexing of his fingers. (PF 48).

33.     Thiboutot drove Fisher home. Fisher's then-fiancé, now wife, drove him to Caritas Good Samaritan Hospital, where he was admitted. (PF Stip.).

34.     Meanwhile, the VA's HVAC technician, Don Foulis, went into the crawl space and looked inside. He saw that the junction box was uncovered and he saw an exposed wire. He tested it and found it was live and 115 volts. He attached a wire nut onto the exposed wire. (PF Stip.).

---

[2] This court makes no finding as to whether Mr. Pruyn spoke to Fisher or Thiboutot. While Mr. Pruyn testified that he spoke with Fisher, this testimony appears inconsistent with all the other testimony of Fisher's condition after the event.

35.     Foulis remembers finding a wire nut in the vicinity of the junction box. (I:75).  After he attached a wire nut to the exposed wire, he did not put a cover on the junction box.  (I:77).

36.     The next morning, the accident site was inspected by Peter Lopes, the Engineering Manager, and David Dombrowski, the Air Conditioning Mechanic Leader. VA electrician Alan McNeil screwed a cover onto the uncovered junction box.  (PF Stip.).  The cover has holes or openings in the back of the box.  These violate safety codes.  (II:205).  It is undisputed, however, that these holes had no role in plaintiff's injury.

37.     Following his accident, Fisher was very slow and his energy level was low. (PF 50).  He was out of work for about six weeks, and returned to work in September 2004.  However, at that time he had difficulty getting his work done and was easily exhausted.  (PF 52; see DF 54).  He had headaches and felt "hazy."  (I:230).  According to Matt Mitchell, it was as if Fisher was "just trying to get through his days."  (II:18).

38.     Fisher was treated by Dr. Aubrey Lieberman, a neurologist who had previously treated Fisher after a concussion he had sustained in November 2000.  (PF 51).

39.     On June 8, 2005, Fisher woke up feeling terrible and called in sick to work. He made arrangements for his mother, Iris Kriesman, to take him to the doctor.  (I:232). When Fisher's mother arrived, she found him laying on his kitchen floor, unresponsive.

He had suffered a seizure.  (PF 53, DF 55)  Ms. Kriesman roused him and took him to

Caritas Good Samaritan Medical Center where he was admitted overnight.  (DF 55).

40.     Fisher has not worked since June 8, 2005.  (DF 56).

### Fisher's Post-Incident Physical Condition

41.     Fisher was treated by Dr. Lieberman at Good Samaritan Hospital.  After a

number of diagnostic tests, Dr. Lieberman diagnosed Fisher with a seizure disorder as a

result of the July 22, 2004 electric shock.  (PF 55).

42.     The parties agree that Fisher suffers from epilepsy.  (See DF 66).  Epilepsy

is a brain disorder in which the patient has repeated seizures.  The seizures typically

begin after a latent period after the injury.  (DF 67).

43.     Fisher eventually began treating with Dr. Donald Schomer, head of Beth

Israel Deaconess Medical Center's Comprehensive Epilepsy Unit.  He began treating

with Dr. Schomer in October 2005, and continued through the time of trial.  (PF 56).

44.     Over time, Dr. Schomer has prescribed a number of medications in an

attempt to get Fisher's seizures under control.  As of trial, the seizures and "bad days"

were much less frequent than in 2005.  However, Fisher's seizures were not fully

controlled.

45.     Fisher described a "typical" day as follows:

> I wake up, take my medicine, wait for my head to clear up.  Maybe
> go for a walk with my dog, send my son off to school.  Kind of don't
> feel good sometimes, so sometimes I'll fall asleep, take a nap.  My
> son comes home, you know, we do his homework and try to play

-12-

> with him or do stuff he wants to do, but it doesn't happen all the
> time.

(I:220).  Fisher described "not feeling good" as follows:

> I'll start to get hazy.  My head will start hurting or I'll get dizzy and
> I'll just kind of sit down to get off my feet and the next thing I know,
> I'm waking up an hour or so later.  I'm assuming I'm sleeping.
> Doctor says it could be seizures, but I'm not positive.

(I:220).

46.     Fisher generally does not go out alone, since he is afraid of having a

seizure.  (I:221).

47.     Fisher cannot handle finances, and he cannot drive.  (PF 80).  He needs to

be reminded several times a day to do basic things such as taking his medicine or taking

dinner out of the freezer.  (PF 87).

48.     Fisher is compliant with his medical regime.  At the time of trial he was

taking Trileptol to control seizures, Gabapentin to sleep, and had just started Banzel,

which was to help with headaches and haziness.  (I:217-18; PF 81).

49.     Fisher's condition was confirmed by his mother, Iris Kriesman, and wife,

Rachel Jenkins Fisher, both of whom I found to be credible witnesses.  Ms. Kriesman

described the plaintiff as still being lethargic, slow, suffering from headaches and having

involuntary twitches in his mouth, eye and hands.  (II:155)  Approximately twice a day,

Fisher will have "staring spells" which last a few minutes.  (II:156).  The sun gives Fisher

headaches.  (II:157).  Similarly, Ms. Fisher confirmed that the plaintiff still had staring

spells, and suffered from twitches.  (II:168-70).  On a good day, Fisher could engage in

"normal daily activities," such as kicking a ball around with his son, going for walks and going out to eat. (II:171). Nevertheless, he continues to be light-sensitive and to have headaches even on a good day. (II:171-72). On a "bad day," he sleeps a lot and is dizzy. (II:170-71). Fisher is very forgetful and has to be frequently reminded to accomplish tasks. (II:176).

50.     Ms. Fisher works and the plaintiff is left at home without supervision. He has responsibilities for maintaining the household and caring for his son while his wife is at work. (See II:174, 176-78). While Mr. Fisher gets help from his mother, she only sees him approximately once a week. (I:217, II:142).

51.     As of the time of his seizure, Fisher was smoking marijuana approximately once a week. (I:255). He tested positive for marijuana when admitted to the hospital on June 8, 2005. (I:255). There was no evidence presented by either party that the use of marijuana contributed to his physical impairments.

52.     Prior to the incident, in November 2000, Fisher had a concussion as a result of a football injury when he was playing without a helmet. (I:256). He was treated and released from the hospital and suffered no symptoms as a result. (See DF 71).

53.     There is some evidence that in 2004 Fisher was hit in the head by a steel beam. (DF 71; PF Stip.). No doctor testified that the 2004 accident was a direct cause of Fisher's epilepsy. (See DF p. 21 n.8).

54.     Fisher reported that even prior to the incident "he has always had a little bit of a problem with his memory" but it got worse after the shock. (I:256-57).

55.     Fisher would like to work, but feels that he is not supposed to do so on doctor's orders until his seizures are under control.  (I:259).

### The Cause of Plaintiff's Epilepsy

56.     I find that the plaintiff has proven by a preponderance of the evidence that Fisher's epilepsy was caused by the electric shock he received on July 22, 2004.

57.     Both parties presented the testimony of exceptionally qualified experts on the issue of whether plaintiff suffered from epilepsy and, if so, whether it was caused by the incident of July 22, 2004.  The government's expert was not sure that Fisher has epilepsy, testifying that there had not been sufficient diagnostic study to determine whether Fisher has epilepsy and that there are many other possible diagnoses for his condition.  (III:88).  For example, but without limitation, according to the defense report, Fisher could be suffering from a sleep disorder, psychiatric disorder, a disassociative state, an infection, or a stroke.  (III:89-90).  However, for present purposes, the government has conceded that Fisher suffers from epilepsy.  (DF 66).  Moreover, this court finds that plaintiff's treating physician, Dr. Schomer, has effectively ruled out these other potential causes of Fisher's physical condition.

58.     Since the qualifications of both experts are impeccable and not in dispute, they will not be addressed in any detail.

59.     The plaintiff presented the testimony (by audio-video deposition) of his treating physician, Dr. Donald L. Schomer.  Dr. Schomer is a professor of clinical neurophysiology at Harvard Medical School.  He runs an epilepsy and clinical neurophy-

siology program at the Beth Israel Deaconess Medical Center where he sees patients and

conducts research.  He has been licensed to practice medicine since 1972.  Dr. Schomer is

a diplomat in the American Board of Qualification and Electroencephalography and has a

number of appointments and publications to his credit.

60.     The government submitted the testimony Dr. Richard Mattson.  Dr. Mattson

has specialized in epilepsy for forty-seven years.  He has taught neurology at Yale

Medical School for forty-two years.  He is also the Director of the epilepsy program at

Yale New Haven Hospital, where he treats patients.  Dr. Mattson is a past president of

the American Epilepsy Society and has published many books, abstracts and other

articles.  (DF 79).

61.     It was Dr. Mattson's opinion that Fisher's epilepsy more likely than not was

caused by his head trauma in 2000, and that the electrical shock played no role in his

condition.  (DF 78).  It was Dr. Schomer's opinion that while the prior trauma may have

made Fisher more susceptible, the electric shock caused Fisher's epilepsy.  (PF 76; see

Ex. 4 at 5 ("In other words, the prior concussion would have predisposed him to suffer

increased damages as a result of the electrocution injury.  But, to a reasonable degree of

medical certainty, the electrocution injury is the direct cause of his current complaints.")).

62.     Other doctors have also opined that Fisher's epilepsy is causally related to

his injury of July 22, 2004, including Dr. Lieberman and Dr. Deepak Tandon who

conducted an IME for the Massachusetts Department of Industrial Accidents on March 7,

2006.  (PF 64-66).  Since these doctors did not engage in a detailed analysis of the cause of Fisher's condition, their opinions will not be discussed further.

63.     According to Dr. Mattson, he never treated anyone for epilepsy resulting from an electrical injury.  (DF 73).

64.     It appears to this court that the study of epilepsy is evolving, and that a great deal remains unknown about how the brain works.  There also was not a great deal of data, one way or the other about the effects of electric shocks of the type suffered by Fisher.  After consideration of the conflicting opinions of two very highly qualified experts, I find persuasive the opinion of Fisher's treating physician, Dr. Schomer, and find that the plaintiff has proved by a preponderance of the evidence that Fisher's epilepsy was caused by the electrical shock he suffered on July 22, 2004.

65.     During his treatment with Dr. Schomer, Fisher has undergone multiple diagnostic tests including MRIs, CT scans, a nerve conduction study, EEGs, a telemetry study, evoked potential testing, autonomic testing, a neuropsychological evaluation, and multiple sleep studies.  (PF 57).  Following such testing, Dr. Schomer has diagnosed Fisher with a seizure disorder, also known as epilepsy.  Since this diagnosis is not disputed (see DF 66), I will not discuss the basis for this diagnosis except as necessary to address the disputed issue of causation.

66.     Fisher had a concussion in November 2000.  Prior to the electric shock, Fisher had not suffered any side effects from the concussion, and all effects of the

concussion had been resolved.  (PF 65, 66).  It was a mild concussion with only a brief loss of consciousness.  (PF 71).

67.     While it is agreed that a brain injury may cause epilepsy, Dr. Schomer testified that 12 months is a classic time frame for presentation of seizures following a head injury.  (PF 70).  This is supported by the medical literature.  (See, e.g., Ex. 66). Even Dr. Mattson testified that following head trauma most individuals suffer their first seizure either immediately or within the first two years.  (PF 70).  In fact, 80% of those who develop seizures from concussions do so within 1 to 2 years.  (PF 71).  Here, Fisher was asymptomatic for 4 years after the concussion.

68.     The chance of a mild concussion causing epilepsy also is very slim.  Thus, epilepsy follows from a mild concussion only .07% of the time.  (PF 71, Ex. 66).

69.     Furthermore, I accept Dr. Schomer's testimony that to the extent closed head injuries cause epilepsy, these injuries are almost always (but admittedly not always) accompanied by changes in the deep white matter of the brain.  However, Fisher's MRI did not show any lesions or other changes in his white matter.  (PF 69).

70.     Given the remoteness in time of Fisher's symptoms, the fact that he had only a minor concussion in 2000, the fact that Fisher's brain scans did not show any changes in the deep white matter of the brain, and the fact that Fisher had no symptoms for four years, I find it more likely than not that his epilepsy was not caused by his concussion.

71.     Fisher's symptoms, with the exception of seizures, began immediately after he received the electrical shock, and continued unabated absent medication.

72.     Admittedly, there is not a great deal of scientific data linking electric shocks to epilepsy, but I find that Dr. Schomer is an expert in the field, and that his opinion is entitled to substantial weight, especially since he has been actively involved in the study and treatment of Fisher since 2005.

73.     The lack of scientific data can be attributed in part to the fact that many severe electric shocks result in death.  (PF 74).  Moreover, there does not seem to have been a study on the effect of electrical shocks on persons previously having a mild head trauma, which is the situation presented in the instant case.

74.     I have considered the fact that Dr. Schomer initially believed that Fisher suffered a much more severe shock than he actually did.  However, Dr. Schomer recon-firmed his opinion after learning that the severity of the shock was lower than originally thought.  (PF 75).

75.     Seizure disorders may develop following electrical injuries because such injuries are insults to the central nervous system.  (PF 67).  Dr. Schomer opined that the electrical current traveled up Fisher's spinal chord to his brain and, more distally, his lower extremities.  (Ex. 4 at 3).

76.     There are examples where electrical injuries have been found to lead to seizure disorders following a latent period when the patient did not have any seizures. (See PF 73-74).  For example, Dr. Mattson referenced an article dated March 2009 where

-19-

a Japanese patient was found to have developed seizures 8 years after a severe electrical shock which entered his head.  (Ex. 5, PF 73).  As the author concluded "even in patients who seem to show a favorable outcome after electrical brain injury, we should consider the possibility of symptomatic epilepsy in the future."  (Ex. 5).  In addition, there was an article published in 1995 concerning patients who developed epilepsy after being struck by lightening.  (III:120-21).  There are a number of publications, including some dating back to the 1960s, which indicate that seizures may be the result of electric shocks.  (III:129-132; PF 74).

77.    While the situations presented in these studies are not identical to Fisher's situation, they do challenge Dr. Mattson's opinion, which was based, in part, on the fact that in his 47 years of practice he has "never seen anybody who had epilepsy due to an electrical injury."  (III:92).

78.    I accept Dr. Schomer's opinion that Fisher's prior head trauma may have been a contributing factor which may have predisposed Fisher to suffer greater neurological damage as a result of the electric shock injury.  Nevertheless, while Fisher's concussion may have predisposed him to suffer greater harm from an electrical shock, it is more likely than not that the shock he received on July 22, 2004 is the direct cause of his seizure disorder.  (PF 77).

## Fisher's Employment Potential

79.    As detailed above, since June 2005, Fisher has experienced various symptoms such as headaches, fatigue, depression and staring spells, which Dr. Schomer

testified were seizures.  (DF 86; PF 78).  In addition, he suffers from twitches, light sensitivity, sensitivity to the sun, cognitive impairment, memory problems and numbness in his fingers.  He sometimes falls asleep after a staring spell.  (PF 78).

80.     Fisher has been trying out a number of medications in an attempt to control his seizures.  None has been entirely successful.  He recently started a new anti-seizure medication called Banzel.  His condition is improving, but it is too early to tell the full effect of the medication.  (PF 82).  Fisher is fully compliant in taking his medication.  (PF 81).

81.     Fisher will not likely be able to return to his work as an HVAC technician.  (PF 97).  He must stay away from machinery and unprotected heights.  (See DF 92).

82.     However, I find that Fisher has failed to prove by a preponderance of the evidence that he is permanently disabled from engaging in any significant employment.  No one has opined that Fisher would never be able to work, including Dr. Schomer.  (DF 89).

83.     Dr. Schomer testified that he believes that Fisher should work if possible, as it would be good for him emotionally, if nothing else.  He is optimistic that Fisher will be able to return to some level of employment, but much of that is dependent on the success of the medication.  (PF 85).

84.     Plaintiff submitted the testimony of a vocational expert, Dr. Peter Cohen.  The government submitted the testimony of Dr. Amy Vercillo, another vocational expert.

Both experts relied on, and assumed, different medical conditions.  As a result, their opinions were divergent.

85.     Dr. Cohen assumed that Fisher would never return to work until his seizures were totally controlled, based on his reading of the medical evaluations.  (See PF 88-91).  However, I find that to the extent that he relies on the medical evaluations of Drs. Lieberman, Tandon and Levine (on behalf of Liberty Mutual) regarding Fisher's ability to return to work, their opinions were either dated or related to Fisher's ability to return to his former position as an HVAC technician.  (See DF 98; Exs. 30, 35, 37).  Even Dr. Schomer did not give an opinion based on any actual criteria for a specific job.  Dr. Schomer believes that it would be good for Fisher to work, he just does not know what kind of jobs would be available for someone with Fisher's condition.  In sum, none of the doctors addressed vocational limitations or engaged in any substantive analysis as to whether Fisher actually had any earning capacity.

86.     Dr. Cohen has no experience with helping epileptics get back to work. (II:92).  I do not find credible his testimony that Fisher has no earning capacity until his seizures are fully controlled at all times.  (See PF 93).

87.     I accept Dr. Cohen's assessment that Fisher is unable to work on an assembly line, or in any other production pace-based occupation, since he cannot keep up with a fast pace and loses his concentration.  (PF 94).  However, I do not accept Dr. Cohen's assessment that there are no jobs available for Fisher, since Dr. Cohen did not

consider any accommodations an employer could make so that an individual suffering from epilepsy could work.  (<u>See</u> DF 98).

88.     Dr. Vercillo has worked a great deal with persons suffering from epilepsy. (DF 96).  I find credible her testimony that there are positions available for people suffering from epilepsy.  (DF 97).

89.     Fisher has not attempted retraining programs and other vocational assistance through the Massachusetts Rehabilitation Commission and the Massachusetts Epilepsy Foundation.  (<u>See</u> DF 93).

90.     The plaintiff has met his burden of proving that, from June 2005 through trial, Fisher was not able to work given the numerous unsuccessful attempts to control his seizures.  However, as of the time of trial his seizures were much less frequent and severe.  (<u>See</u> DF 94-95).  Given the relative stability of his condition, I find that he could begin working in October 2009.

91.     I accept Dr. Vercillo's testimony that Fisher may be trained to perform sedentary, unskilled jobs such as Production Helper, Inspector, Sorter, and Shipping Checker.  (DF 97). While there may be some need to supervise Fisher in these tasks, I find that they could be undertaken with reasonable accommodations by an employer.

92.     In finding that Fisher would qualify for these jobs, I have considered his physical limitations.  I find that his seizures are sporadic and not lengthy.  While he has some tremors and/or numbness in his hands, and suffers from headaches and fatigue, Fisher is able to accomplish household chores in an unsupervised manner.  Similarly,

although Fisher suffers from memory loss, reminders seem sufficient to allow him to complete his tasks.  In general, Fisher is left alone in his home, on his own, and is entrusted with the physical care of his son.  Under such circumstances, I find that Fisher is able to be employed.

93.     However, I find that Dr. Vercillo's estimate about the wages Fisher was likely to earn was overly optimistic.  As an initial matter, Dr. Vercillo inappropriately used a mean wage, not a starting wage.  (See DF 97; PF 101).  Moreover, I do not accept Dr. Vercillo's assessment that Fisher can work 8 hours per day, 40 hours per week.  Dr. Vercillo did not consider Fisher's lack of energy in addressing Fisher's ability to return to work.  (See PF 108).

94.     The starting wages for the positions identified by Dr. Vercillo were between $9-14/hour.  (PF 102).

95.     The government's expert, Mr. Patrick Ormond, calculated Fisher's lost earning capacity based on Fisher being employed in the future with a beginning hourly rate of $18.49.  That is incorrect since, as noted above, that is the mean wage not the beginning wage for the employment identified by Dr. Vercillo.  (See PF 111).

96.     The plaintiff's expert economist, Dr. Dana Hewins, assumed that Fisher would never work again.  As such, he calculated Fisher's net economic loss, reduced to present value, to be between $1.6-1.7 million.  (PF 117).  The government does not challenge Dr. Hewins' methodology or calculations.  Rather, the government disputes Dr. Hewins' assumption that Fisher will never return to work.

97.     Fisher's past medical bills total approximately $75,000.  (Ex. 60; PF 118).

98.     Fisher will continue to need medical care indefinitely.  His life expectancy is 44.5 years.  (PF 119).

99.     Plaintiff's estimate of future medical bills went unchallenged by the government.  According to the plaintiff, at present, Fisher has medical bills of approximately $10,244 per year for medical visits and medications.  EEGs cost an average of $2,500 and will be needed approximately every 3 years for a total of $37,500.  I find that Fisher's reasonably anticipated future medical expenses total in excess of $493,000.  (PF 120).

100.    Fisher's last day of work was July 8, 2005.  At the time, he was earning $25/hour plus benefits.  (DF 99).

101.    Fisher's lost wages and benefits for the period July 8, 2005 to October 1, 2009, based on my finding that he could not work in that period, was $262,745.  (DF 100c).

102.    Fisher's lost earning capacity for the period October 1, 2009 through age 64, reduced to present value and net of taxes, is roughly between $1,078,267 and $1,145,649 if Fisher earns $8/hour plus benefits and works full time.  (DF 101b).  If Fisher can earn $18.49/hour plus benefits, his lost earning capacity, reduced to present value and net of taxes, is between $321,485 and $341,578.  (DF101a).

103.    I find that Fisher is likely to earn more than $8/hour, but not likely to be able to work full time, at least initially.  I estimate that his future lost earning capacity, reduced to present value and net of taxes, is $900,000.00.

104.    Fisher is entitled to recover for the pain and suffering he has endured and will continue to endure.  I award $200,000.00 for such damages.

105.    Therefore, I find Fisher suffered the following damages:

| | |
|---|---:|
| Past medical bills | $    75,000 |
| Future medical bills | 493,000 |
| Past lost earning capacity | 262,745 |
| Future lost earning capacity | 900,000 |
| Pain and suffering | 200,000 |
| | $1,930,745 |

## RULINGS OF LAW

1.    This action was brought under the Federal Torts Claims Act ("FTCA"). The FTCA waives sovereign immunity for certain negligence claims.  28 U.S.C. § 1346(b)(1).  There is no strict liability under the FTCA.  Laird v. Nelms, 406 U.S. 797, 802-03, 92 S. Ct. 1899, 1902, 32 L. Ed.2d 499 (1972).

2.    Under the FTCA, the United States may be held liable for negligence causing personal injury to Fisher only if a private person would be liable to him under "the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1). Therefore, Massachusetts law applies.  Hewitt v. United States, 550 F. Supp. 589, 591 (D. Mass. 1982).

3.    "To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage."  Jupin v. Kask, 447 Mass. 141, 146, 849 N.E.2d 829, 834-35 (2006).  Fisher

-26-

bears the burden of proof on each element of his negligence claim.  Glidden v. Maglio, 430 Mass. 694, 696, 722 N.E.2d 971, 973 (2000).

    4.    "A landowner must exercise reasonable care to maintain his premises in a safe condition, but he is not an insurer of the safety of all entrants.  He must take reasonable steps to keep the premises in repair and warn entrants of hidden dangers, but he does not have a duty to warn of open and obvious dangers."  Ryba v. LaLancette, 417 F. Supp. 2d 199, 205 n.10 (D. Mass. 2006), and cases cited.

    5.    "A landowner's duty of care includes an obligation to maintain the premises in a reasonably safe condition and to warn visitors of any unreasonable dangers of which the landowner is aware or reasonably should be aware."  Ryba v. LaLancette, 417 F. Supp. 2d 199, 205 n.11 (D. Mass. 2006) (internal quotation and punctuation omitted).

    6.    Under Massachusetts law, "[a]n owner or possessor of land owes a common-law duty of reasonable care to all persons lawfully on the premises.  This duty includes an obligation to maintain his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk, and to warn visitors of any unreasonable dangers of which the landowner is aware or reasonably should be aware.  However, a landowner is not obliged to supply a place of maximum safety, but only one which would be safe to a person who exercises such minimum care as the circumstances reasonably indicate.  Moreover, it is well established in our law of negligence that a landowner's duty to protect lawful visitors against dangerous conditions on his property ordinarily

does not extend to dangers that would be obvious to persons of average intelligence. Landowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising (as the law presumes) reasonable care for his own safety would suffer injury from such blatant hazards.  Stated otherwise, where a danger would be obvious to a person of ordinary perception and judgment, a landowner may reasonably assume that a visitor has knowledge of it and, therefore, any further warning would be an empty form that would not reduce the likelihood of resulting harm." O'Sullivan v. Shaw, 431 Mass. 201, 204, 726 N.E.2d 951, 954-55 (2000) (internal quotations and citations omitted).

7.      The National Fire Code as promulgated in NFPA 70E: Article 215.1 Covers for Wiring System Components regulations applied to the Brockton VA and required that the junction box be covered.  The VA violated this regulation, and this violation is evidence of negligence.  Perry v. Medeiros, 369 Mass. 836, 840-41, 343 N.E.2d 859, 862 (1976).

8.      Fisher has met his burden of proving by a preponderance of the evidence that an employee of the VA hospital left the junction box uncovered and created the dangerous situation.

9.      It was negligent for the VA to have left the junction box uncovered and, since a VA employee left it uncovered, the VA knew or should have known of the dangerous condition.

-28-

10.     Since the crawl space was dark and not easily accessible, the defect caused by the uncovered junction box was not so obvious, or so easily discoverable by reasonable inspection, so as to negate the duty to warn.  Similarly, since the opened junction box was not visible unless one shone a light on the flooring of the crawl space, there was not an open and notorious condition that relieved the VA of its duty to warn.

11.     To perform the task he was hired to do by the VA, Fisher had to go into the crawl space.  Fisher had the right to expect that the crawl space was safe, and that the defendant would take every reasonable means to insure his safety.  Lajeunesse v. Tichon's Fish & Fillet Corp., 328 Mass. 528, 531, 105 N.E.2d 245, 247 (1952).  This is especially true where, as here, "there was a hidden danger and the defendant was in a superior position to know of its existence."  Gobern v. Metals & Controls, Inc., 418 F.2d 290, 295 (1st Cir. 1969).

12.     For his part, Fisher was obligated to exercise reasonable care for his own safety.  O'Sullivan v. Shaw, 431 Mass. 201, 204, 726 N.E.2d 951, 954 (2000).

13.     "It is settled that mere knowledge that some danger exists is not conclusive of the negligence of one who fails to avoid it."  Gobern v. Metals & Controls, Inc., 418 F.2d 290, 295 (1st Cir. 1969) (internal quotation omitted).

14.     The burden of proving that Fisher was careless or negligent is on the defendant.  A plaintiff is presumed to be in the exercise of due care at the time of the injury, and the defendant has the burden of proving that a plaintiff failed to exercise that degree of care which an average, reasonably prudent person ordinarily exercises under like

circumstances.  Hubbard-Hill Chem. Co. v. Silverman, 340 F.2d 402, 405 (1ˢᵗ Cir. 1965); Mass. Gen. Laws ch. 231, § 85.

15.     In the instant case, in light of the fact that Fisher had the right to expect the crawl space to be safe, I find that his inspection of the space met at least a minimum requirement of what a reasonably prudent person with Fisher's knowledge and experience would exercise under like circumstances.

16.     Fisher exercised at least the "minimum care as the circumstances reasonably indicate."  Lyon v. Morphew, 424 Mass. 828, 833, 678 N.E.2d 1306, 1310 (1997) (quotation omitted).   However, Fisher was negligent in that he did not conduct a more thorough investigation before hoisting himself into the crawl space, and did not use a higher ladder so that he could see more clearly into the crawl space.

17.     While there would be no reason to expect that the VA would not comply with basic safety requirements of preventing live wires from being exposed, Fisher should have been aware of general dangers in a crawl space in an old building so as to have conducted a more thorough inspection.  I find that the VA met its burden of proving that Fisher was contributorily negligent.

18.     I find that Fisher is 50% negligent and his damages will be reduced accordingly.  Mass. Gen. Law ch. 231, § 85.

19.     Fisher has met his burden of proving that the electric shock he sustained was the proximate cause of his injuries in that it was "an effective and contributory

-30-

cause" of his epilepsy and other damages.  See Jones v. Hayden, 310 Mass. 90, 95, 37

N.E.2d 243, 246 (1941).

20.     A defendant must take his victim as he finds him, and is liable for all the

consequences of his acts, even when the consequences combine with a pre-existing injury

or condition to bring about a greater harm to the plaintiff.  Wallace v. Ludwig, 292 Mass.

251, 256, 198 N.E. 159, 162 (1935); McGrath v. G&P Thread Co., 353 Mass. 60, 63, 228

N.E.2d 450, 453 (1967); Restatement (Second) Torts § 461 (1965).

21.     "A plaintiff who has suffered physical injury through the fault of a

defendant is entitled to recover for pain and suffering; for reasonable expenses incurred

by him for medical care and nursing in the treatment and cure of his injury; for

diminution in his earning power; and for such pain and suffering and such expenses and

diminution of earning capacity as are shown to be reasonably probable to continue in the

future.  The measure of damages is fair compensation for the injury sustained."  Rodgers

v. Boynton, 315 Mass. 279, 280, 52 N.E.2d 576, 577 (1943).

22.     "The assessment of damages for impairment of earning capacity rests

largely within the common knowledge of the [factfinder], sometimes with little aid from

evidence."  Griffin v. General Motors Corp., 380 Mass. 362, 366, 403 N.E.2d 402, 405

(1980).

23.     "While proof of damages does not require mathematical precision, it must

be based on more than mere speculation."  Squeri v. McCarrick, 32 Mass. App. Ct. 203,

209, 588 N.E.2d 22, 26 (1992).

24.     The ADA and Mass. Gen. Laws ch. 151B require an employer to provide a

reasonable accommodation of Fisher's epilepsy.  <u>Sensing v. Outback Steakhouse of Fla,</u>

<u>LLC</u>, 575 F.3d 145, 153-54 (1st Cir. 2009); <u>Tobin v. Liberty Mut. Ins. Co.</u>, 553 F.3d 121,

136 (1st Cir. 2009).

25.     This court agrees that the fact that the Social Security Administration found

Fisher eligible for SSDI benefits is not binding on this court and does not establish that

Fisher is unable to work.  <u>See</u> <u>Seavey v. Barnhart</u>, 276 F.3d 1,8 (1st Cir. 2001); <u>Enica v.</u>

<u>Principi</u>, 544 F.3d 328, 337 (1st Cir. 2008).

26.     For the reasons detailed more fully in this court's September 10, 2009

Order on Parties' Motions in Limine (Docket No. 48), which is incorporated herein by

reference, SSI benefits are not deductible from any damages Fisher is awarded for lost

pay and/or lost earning capacity under Mass. Gen. Laws ch. 231, § 60G.

## <u>CONCLUSIONS</u>

1.     The plaintiff has proved by a preponderance of the evidence that the VA

was negligent in leaving the junction box uncovered and in not properly securing the end

of the wire.

2.     The plaintiff has proved by a preponderance of the evidence that the

electric shock he received on July 22, 2004 was the proximate cause of the epilepsy from

which he suffers.

3.      The plaintiff has proved by a preponderance of the evidence that Fisher has
suffered a lost earning capacity.  However, he has not proved by a preponderance of the
evidence that he is permanently disabled from engaging in any significant employment.

4.      The plaintiff has proved by a preponderance of the evidence that Fisher
suffered the following damages:

| | |
|---|---:|
| Past medical bills | $   75,000 |
| Future medical bills | 493,000 |
| Past lost earning capacity (through 10/1/09) | 262,745 |
| Future lost earning capacity | 900,000 |
| | $1,730,745 |

5.      I also find that while the plaintiff has continued to enjoy the love and
support of his family, including his new wife, son and mother, he has endured pain and
suffering both physical and emotional as a result of his present limitations.  I award the
plaintiff $200,000 for such pain and suffering.

6.      The government has proved by a preponderance of the evidence that Fisher
was contributorily negligent in that he failed to fully inspect the crawl space before going
in.  I find that Fisher was 50% negligent.

THEREFORE, judgment shall enter in favor of Fisher in the amount of
$965,372.50

            / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge